IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 23-cv-01054-PAB-NRN

ILLINOIS UNION INSURANCE COMPANY,

      Plaintiff, Counter Defendant,

v.

CLUB VALENCIA CONDOMINIUM OWNERS ASSOCIATION, INC.,

      Defendant, Counterclaimant, Third-Party Plaintiff,

v.

LCM PROPERTY MANAGEMENT, INC.,
CHERRY CREEK INSURANCE AGENCY, INC., d/b/a CCIG, and
CRC INSURANCE SERVICES, LLC,

      Third-Party Defendants.
_____

**ORDER**
_____

      The matters before the Court are third-party defendant CRC Insurance Services,

LLC's Motion to Dismiss Defendant's Counterclaims and Third-Party Claims [Docket

No. 89] and Third-Party Defendant Cherry Creek Insurance Agency, Inc.'s Motion to

Dismiss Club Valencia Condominium Association, Inc.'s Third Amended Answer,

Counterclaims, and Third-Party Claims [ECF 86] [Docket No. 91].  The Court has

jurisdiction pursuant to 28 U.S.C. § 1332.

## I.  PROCEDURAL BACKGROUND

      On April 26, 2023, plaintiff Illinois Union Insurance Company ("Illinois Union")

filed suit against defendant Club Valencia Condominium Owners Association, Inc.

("Club Valencia").  Docket No. 1.  Club Valencia is the condominium association for the

owners of the condominiums at Club Valencia, a condominium complex located in

Denver, Colorado.  Docket No. 86 at 30, ¶¶ 14–15.  Illinois Union seeks a declaratory

judgment that it is not required to indemnify Club Valencia for fire damage sustained to

the condominium complex, which is insured by Illinois Union.[1]  Docket No. 1 at 9–12,

¶¶ 50–69.  Illinois Union claims that, under the terms of its insurance policy with Club

Valencia, Club Valencia was required to have hard-wired smoke detectors in each of its

condominium units.  *Id.* at 2–3, ¶ 11.  Illinois Union alleges that Club Valencia did not

have the required smoke detectors in each unit and that, under the applicable policy

exclusion, Illinois Union is not required to pay for damage to Club Valencia's property

caused by fires in 2022 and 2023.  *Id.* at 2, 9–12, ¶¶ 9, 50–69.  Club Valencia disputes

that Illinois Union is not required to indemnify it for losses caused by the fires.  *See*

Docket No. 86 at 2–26, ¶¶ 1–69.

On November 3, 2023, Club Valencia amended its answer to add third-party

claims against third-party defendants LCM Property Management, Inc. ("LCM"), Cherry

Creek Insurance Agency, Inc. ("CCIG"), and CRC Insurance Services, LLC ("CRC")

based on their alleged failure to properly procure insurance for Club Valencia that

covers Club Valencia's losses from the 2022 and 2023 fires.  Docket No. 32 at 28–51,

---

[1] Third-party defendants Cherry Creek Insurance Agency, Inc. and CRC
Insurance Services, LLC seek to dismiss the claims brought against them in Club
Valencia's Third Amended Answer, Counterclaims, and Third-Party Claims.  *See*
Docket Nos. 86, 89, 91.  The Court takes judicial notice of Illinois Union's complaint for
the fact that Illinois Union is seeking a declaratory judgment against Club Valencia and
regarding other background facts that provide context for Club Valencia's third-party
claims against defendants LCM Property Management, Inc. and Cherry Creek
Insurance Agency, Inc.  *Rivera-Bottzeck v. Ortiz*, 241 F. App'x 485, 487 (10th Cir. 2007)
(unpublished) ("the court is permitted to take judicial notice of its own files and records").
However, the Court does not take the allegations in Illinois Union's complaint regarding
its claims against Club Valencia as true for purposes of ruling on the motions to dismiss.

¶¶ 1–151.  Club Valencia states that, although "Club Valencia COA disputes Illinois Union Insurance's coverage position," if "Illinois Union Insurance's coverage position is confirmed, then Club Valencia COA must seek relief from the agents/producers that failed to procure the insurance coverage requested and failed to notify Club Valencia COA of their inability to obtain the coverage requested."  Docket No. 106 at 3.  On March 20, 2024, Club Valencia filed its Third Amended Answer, Counterclaims, and Third-Party Claims.  Docket No. 86.  As part of its third-party claims, Club Valencia brings claims against CCIG for breach of fiduciary duty, breach of implied contract, and negligence.  *Id.* at 55–58, ¶¶ 176–94.  Club Valencia brings claims against CRC for breach of fiduciary duty, breach of implied contract, breach of contract, negligence, and violations of the Colorado Consumer Protection Act ("CCPA").  *Id.* at 59–64, ¶¶ 195–224.

On April 9, 2024, CCIG and CRC filed separate motions to dismiss Club Valencia's third-party claims against them.  Docket Nos. 89, 91.  On April 30, 2024, Club Valencia responded to CCIG's and CRC's motions to dismiss.  Docket Nos. 105, 106.  CCIG and CRC replied.  Docket Nos. 107, 108.

## II.  FACTUAL BACKGROUND[2]

Club Valencia is the duly authorized condominium association for the owners of the condominiums at Club Valencia, a condominium complex located in Denver, Colorado.  Docket No. 86 at 30, ¶¶ 14–15.  The condominium complex consists of 329 condominium units, common areas, a clubhouse, and an office.  *Id.*, ¶ 15.  LCM acted

---

[2] The following facts are taken from Club Valencia's Third Amended Answer, Counterclaims and Third-party Claims, Docket No. 86, and are presumed true for the purpose of ruling on the motions to dismiss.

as Club Valencia's property manager.  *Id.*, ¶ 16.  Among LCM's responsibilities as

property manager was the administration of insurance for the condominium complex.

*Id.* at 31, ¶ 20.  LCM was responsible for communicating with Club Valencia regarding

the terms and conditions of any insurance policy procured by LCM, including the

existence of "protective safeguards" in the policy.  *Id.*, ¶ 23.

At all relevant times, CCIG acted as an insurance agent and advisor for Club

Valencia and its agent, LCM.  *Id.* at 32, ¶ 26.  CCIG held itself out to Club Valencia as

an expert in the insurance field.  *Id.*, ¶ 27.  CCIG acted as an insurance advisor for Club

Valencia since 2019 and has been involved in four renewals of insurance for Club

Valencia.  *Id.*, ¶ 28.  CCIG procured multiple policies and multiple kinds of insurance for

Club Valencia.  *Id.*, ¶ 29.  CCIG obtained knowledge about the condominium complex

and the particular insurance needs of Club Valencia.  *Id.*, ¶ 30.  LCM requested CCIG

obtain insurance for Club Valencia that (1) was based on the existing condition and

features of the condominium complex, (2) would provide coverage in the event of a fire,

and (3) otherwise complied with Colorado law and Club Valencia's governing

documents.  *Id.* at 32–33, ¶ 31.

In its 2022 "Insurance Proposal," CCIG states that it can "design insurance plans

custom-built to suit our clients' specific needs and secure better coverage terms and

competitive pricing."  *Id.* at 33, ¶ 34.  The insurance proposal included specific

recommendations about additional types of coverage Club Valencia may wish to

consider.  *Id.*, ¶ 35.  Over the course of CCIG's relationship with Club Valencia, CCIG

produced insurance newsletters that provided Club Valencia and condominium owners

with information about the scope and types of coverage they should procure.  *Id.* at 34,
¶¶ 37–43.

At all relevant times, CRC acted as the wholesale insurance agent for Club
Valencia.  *Id.* at 36, ¶ 52.  CRC held itself out as an "advisor" to Club Valencia.  *Id.*
CRC has had a professional relationship with Club Valencia for over 12 years.  *Id.* at 37,
¶ 53.  CRC has conducted and charged Club Valencia for multiple compliance
inspections for insurance policies it has obtained and renewed for Club Valencia.  *Id.*,
¶¶ 54–55.  CRC is identified as a "producer" on Club Valencia's insurance policy with
Illinois Union.  *Id.*, ¶ 57.  Through its relationship with Club Valencia and CCIG, CRC
learned of the features, age, and general condition of the condominium complex, as well
as of challenges the condominium complex may have in obtaining insurance.  *Id.* at 37–
38, ¶¶ 57–64.  CCIG conveyed to CRC LCM's request to obtain insurance for Club
Valencia that was based on the existing condition and features of the building and that
would provide coverage in the event of a fire.  *Id.* at 38, ¶ 65.

Illinois Union issued insurance policy #D42258003 005 (the "Illinois Union
insurance policy") to Club Valencia.  *Id.* at 40, ¶ 71.  The Illinois Union insurance policy
is an all-risk replacement cost value policy and covers loss to the condominium
complex, including fire losses.  *Id.*, ¶ 76.  Fire indemnity benefits are a covered loss
under the Illinois Union insurance policy.  *Id.* at 42, ¶ 88.  LCM, CCIG, and CRC knew or
should have known about the potential inclusion of protective safeguards in the Illinois
Union insurance policy.  *Id.* at 43, ¶ 100.  LCM, CCIG, and CRC did not provide a copy
of the Illinois Union insurance policy to Club Valencia before November 3, 2022.  *Id.* at
43, ¶ 101.  LCM, CCIG, and CRC did not communicate with Club Valencia regarding

5

the potential inclusion of protective safeguards in the Illinois Union insurance policy or whether the condominium complex was in compliance with any protective safeguards being considered for inclusion in the Illinois Union insurance policy.  *Id.*, ¶ 102.

On November 3, 2022, a fire occurred at the condominium complex.  *Id.* at 41, ¶ 84.  The damage from the November 3, 2022 fire is likely to exceed $12,000,000.  *Id.* at 42, ¶ 87.  Illinois Union has denied coverage for the damage caused by the November 3, 2022 fire.  *Id.*, ¶ 89.  Illinois Union cites a lack of protective safeguards as one reason for the denial.[3]  *Id.*, ¶ 90.  CRC communicated with Illinois Union that CRC believed that the fire damage was covered by the policy.  *Id.* at 42–43, ¶¶ 91–97.  On February 1, 2023, a second fire occurred in the condominium complex.  *Id.* at 45, ¶ 111. The damage from the February 1, 2023 fire is likely to exceed $4,000,000.  *Id.* at 46, ¶ 112.  Illinois Union has denied coverage for the damage caused by the February 1, 2023 fire.  *Id.*, ¶ 113.

CRC was not licensed and properly registered in the state of Colorado to sell or place the Illinois Union insurance policy.  *Id.* at 47–48, ¶ 124.  CRC has not had a valid Colorado insurance license since 2007.  *Id.* at 48, ¶ 125.  Had Club Valencia known that CRC was not licensed to procure insurance, it would not have allowed CRC to place the Illinois Union insurance policy.  *Id.*, ¶ 130

### III.  LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must allege enough factual matter that, taken as true, makes the plaintiff's "claim to relief . . . plausible on its face."  *Khalik v. United Air Lines*, 671

---

[3] Illinois Union also claims that Club Valencia obstructed its investigation of the fire, which is a separate basis for denying coverage.  Docket No. 1 at 10, ¶ 53.

F.3d 1188, 1190 (10th Cir. 2012) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "The 'plausibility' standard requires that relief must plausibly follow from the facts alleged, not that the facts themselves be plausible." *RE/MAX, LLC v. Quicken Loans Inc.*, 295 F. Supp. 3d 1163, 1168 (D. Colo. 2018) (citing *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008)). Generally, "[s]pecific facts are not necessary; the statement need only 'give the defendant fair notice of what the claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam) (quoting *Twombly*, 550 U.S. at 555) (alterations omitted). A court, however, does not need to accept conclusory allegations. *See, e.g.*, *Hackford v. Babbit*, 14 F.3d 1457, 1465 (10th Cir. 1994) ("[W]e are not bound by conclusory allegations, unwarranted inferences, or legal conclusions.").

"[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quotations and alterations omitted); *see also Khalik*, 671 F.3d at 1190 ("A plaintiff must nudge [his] claims across the line from conceivable to plausible in order to survive a motion to dismiss." (quoting *Twombly*, 550 U.S. at 570)). If a complaint's allegations are "so general that they encompass a wide swath of conduct, much of it innocent," then plaintiff has not stated a plausible claim. *Khalik*, 671 F.3d at 1191 (quotations omitted). Thus, even though modern rules of pleading are somewhat forgiving, "a complaint still must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." *Bryson*, 534 F.3d at 1286 (alterations omitted).

## IV. ANALYSIS

CCIG and CRC argue that Club Valencia has failed to plausibly allege any of Club Valencia's claims against them. *See* Docket Nos. 89, 91. The Court will first consider whether Club Valencia has stated claims for breach of fiduciary duty and negligence against CCIG and CRC.

### A. Breach of Fiduciary Duty and Negligence

#### 1. Breach of Fiduciary Duty Claim Against CCIG

Under Colorado law,[4] to "prove a breach of fiduciary duty, the [plaintiff] must prove (1) that the defendant was acting as a fiduciary of the plaintiff; (2) that the defendant breached a fiduciary duty to the plaintiff; (3) that the plaintiff incurred damages; and (4) that the defendant's breach of fiduciary duty was a cause of the plaintiff's damages." *Sewell v. Great N. Ins. Co.*, 535 F.3d 1166, 1172 (10th Cir. 2008) (citing *Graphic Directions, Inc. v. Bush,* 862 P.2d 1020, 1022 (Colo. App. 1993)).

"Colorado follows the general rule that insurance agents have a duty to act with reasonable care toward their insureds, but, absent a special relationship between the insured and the insurer's agent, that agent has no affirmative duty to advise or warn his or her customer of provisions contained in an insurance policy." *Kaercher v. Sater*, 155 P.3d 437, 441 (Colo. App. 2006) (citing *Est. of Hill v. Allstate Ins. Co.*, 354 F. Supp. 2d 1192, 1197 (D. Colo. 2004)); *see also Bear, LLC v. Marsh USA, Inc.*, 2018 WL 1905458, at *5 (S.D. Cal. Apr. 20, 2018), *aff'd sub nom. Certain Interested Underwriters*

---

[4] The parties assume Colorado law applies in this case. *See* Docket No. 89 at 3; Docket No. 91 at 3; Docket No. 105 at 5. Accordingly, the Court will apply Colorado law. *Grynberg v. Total S.A.*, 538 F.3d 1336, 1346 (10th Cir. 2008) ("Because the parties' arguments assume that Colorado law applies, we will proceed under the same assumption.").

*at Lloyd's, London v. Bear, LLC*, 796 F. App'x 372 (9th Cir. 2019) (unpublished) (applying Florida law) ("a finding of a special relationship is rare and an exception to the general rule of no duty to advise" (citing *Tiara Condo. Ass'n, Inc. v. Marsh, USA, Inc.*, 991 F. Supp. 2d 1271, 1280 (S.D. Fla. 2014); *Voss v. Netherlands Ins. Co.*, 8 N.E.3d 823, 829 (N.Y. 2014)); *Holborn Corp. v. Sawgrass Mut. Ins. Co.*, 304 F. Supp. 3d 392, 404 (S.D.N.Y. 2018) (applying New York law) ("Special relationships in the insurance brokerage context are the exception, not the norm" and "[i]nsureds bear the burden of proving a special relationship" (citations and alterations omitted)). "The general duty of the insurer's agent to the insured is to refrain from affirmative fraud, not to watch out for all rights of the insured and inform the latter of them." *Kaercher*, 155 P.3d at 441 (citation omitted). "Consistent with this general rule, an insurance agent or company does not have a common law duty to ensure complete protection to the policyholder or to recommend higher policy limits, but only has a duty to exercise a reasonable duty of care." *Apodaca v. Allstate Ins. Co.*, 232 P.3d 253, 259 (Colo. App. 2009), *aff'd*, 255 P.3d 1099 (Colo. 2011).

"Whether a special relationship has been formed turns on whether there is 'entrustment,' that is, whether the agent or broker assumes additional responsibilities beyond those which attach to an ordinary, reasonable agent possessing normal competencies and skills." *Kaercher*, 155 P.3d at 441 (citing *Parker v. State Farm Mut. Auto. Ins. Co.,* 630 N.E.2d 567, 570 (Ind. Ct. App. 1994)). "Some of the factors relevant to developing entrustment between the insured and the insurer include: exercising broad discretion to service the insured's needs; counseling the insured concerning specialized insurance coverage; holding oneself out as a highly-skilled insurance

9

expert, coupled with the insured's reliance upon the expertise; and receiving compensation, above the customary premium paid, for [the] expert advice provided." *Platte River Power Auth. v. Gallagher Benefit Servs., Inc.*, No. 20-cv-02353-CMA-MEH, 2020 WL 6281596, at *3 (D. Colo. Oct. 27, 2020) (citing *Parker*, 630 N.E.2d at 570; 4 Couch on Insurance § 55:5).

CCIG argues that Club Valencia has failed to plausibly allege that it had a special relationship with Club Valencia such that CCIG breached a fiduciary duty to warn Club Valencia of the policy exclusions that Illinois Union claims exempt the fires from coverage. Docket No. 91 at 3–11.

Club Valencia responds that CCIG did have a special relationship with Club Valencia and that CCIG breached its duty to warn Club Valencia of the policy exclusions in the Illinois Union insurance policy. Docket No. 106 at 7–12. Club Valencia argues that it has plausibly alleged that CCIG had a special relationship with Club Valencia because CCIG held itself out as an expert in the insurance field. *Id.* at 8. Club Valencia asserts that CCIG prepared newsletters, held meetings, and exchanged emails with Club Valencia "discussing the challenges of the relevant insurance coverage," which Club Valencia contends demonstrates that CCIG represented to Club Valencia that it was an expert in the insurance industry and that Club Valencia relied on CCIG's expertise. *Id.* at 9.

Club Valencia's allegations regarding CCIG's communications with Club Valencia demonstrate only that CCIG was attentive in procuring insurance for the condominium complex and offered to procure additional insurance for Club Valencia and condominium owners. *See* Docket No. 86 at 32–36, ¶¶ 26–51. In Club Valencia's

counterclaims and third-party claims, Club Valencia alleges that CCIG represented to it that CCIG "can design insurance plans custom-built to suit our clients' specific needs." *Id.* at 33, ¶ 34 (quotations omitted). Club Valencia states that, in addition to producing a 2022 insurance proposal, CCIG provided multiple insurance newsletters to Club Valencia and condominium owners that advised about the insurance they should procure. *Id.* at 34, ¶¶ 37–43. Finally, Club Valencia alleges that Pat Wilderotter, CCIG's Executive Vice President, held community meetings to provide information on insurance and that she communicated with CRC about Club Valencia's specific insurance needs. *Id.* at 33–34, 38, ¶¶ 33, 44, 61–63.

These communications are insufficient to demonstrate that CCIG held itself out as "a highly-skilled insurance expert," *Platte River*, 2020 WL 6281596, at *3, or that CCIG's conduct was beyond the scope of an ordinary insurance broker. *See Sewell*, 535 F.3d at 1171 ("The representations on PLI's website to which the Sewells direct us, including the financial wherewithal of the insurer, the need to understand and analyze the insured, the importance of proper amounts of insurance for adequate risk management, and the availability of UM/UIM coverage, are really no different than an agent holding himself out as knowledgeable about insurance and attentive to the needs of individual insureds which, as a matter of Colorado law, are insufficient to create any legally meaningful level of 'entrustment.'"); *see also Apodaca*, 232 P.3d at 259 ("Even when an agent represents that he or she is knowledgeable about insurance coverages, and regularly in the course of his or her business, informs, counsels, and advises customers about their insurance needs, the agent does not incur duties beyond those of the standard policyholder-insurance agent relationship."); *Holborn*, 304 F. Supp. 3d at

405 (applying New York law) ("All insurance customers are seeking the most advantageous insurance policy, and as a result, a discussion generally about what policy will be the most advantageous does not suggest 'that the Plaintiff enjoyed anything other than an ordinary consumer-agent insurance relationship.'" (quoting *Long Beach Road Holdings, LLC v. Foremost Ins. Co.*, 75 F. Supp. 3d 575, 590 (E.D.N.Y. 2015) (applying New York law)).

Club Valencia maintains that, through its years-long relationship with CCIG, CCIG gained particular knowledge about the condominium complex and that this evidences a special relationship. Docket No. 106 at 9. However, CCIG's multiyear relationship with Club Valencia alone does not demonstrate a fiduciary relationship. *See* 4 Couch on Insurance § 55:5 (a "special relationship also exists when there is a long-term relationship of confidence in which the agent assumes a duty to render advice and is compensated accordingly, beyond the normal premiums"); *see also Shulman v. Concord Gen. Mut. Ins. Co.*, 618 F. Supp. 3d 165, 177 (D. Vt. 2022) (applying Vermont law) ("Although the complaint alleges a 'long-standing' relationship between F & S and plaintiffs and that plaintiffs relied on F & S's expertise, the length of the relationship does not alone support the existence of a fiduciary duty." (citing *Booska v. Hubbard Ins. Agency, Inc.*, 627 A.2d 333, 335 (Vt. 1993) (applying Vermont law) (12-year relationship alone does not support the existence of fiduciary duty)). Moreover, gaining knowledge of the condition and features of the condominium complex is insufficient for CCIG to become a fiduciary to Club Valencia. *See Scott v. Buckner Co.*, No. 19-cv-00170-TMT-KAS, 2024 WL 1911226, at *13 (D. Colo. May 1, 2024) (rejecting plaintiff's argument that defendant's "'efforts to evaluate its client's coverage needs' through the use of

12

'Contractor Questionnaires Koszinowksi created to obtain information pertinent to his clients' needs' created a special relationship." (citing *Sewell*, 535 F.3d at 117) (alterations omitted)).

Furthermore, although Club Valencia maintains that CCIG used its knowledge of the condominium complex to advise Club Valencia about "specialized insurance coverage needs," Docket No. 106 at 11, Club Valencia fails to allege what these specialized needs were. Docket No. 86 at 36, ¶ 49 ("CCIG would obtain insurance based on the existing conditions and features of the Insured Premises that would comply with Club Valencia COA's insurance requirements and obligations pursuant to its governing documents, comply with Colorado law, and would provide coverage of the Insured Premises in the event of a fire"). Moreover, Club Valencia does not allege that it received any form of specialized insurance or that the Illinois Union insurance policy was special in some way. *See generally id.* Instead, Club Valencia alleges that the Illinois Union insurance policy "is an all-risk replacement cost value policy and covers loss to the Insured Premises including fire losses." *Id.* at 40, ¶ 76. These allegations do not plausibly allege that CCIG counseled Club Valencia "concerning specialized insurance coverage." *Platte River*, 2020 WL 6281596, at *3.

Club Valencia asserts that CCIG had discretion when procuring insurance for the condominium complex because "CCIG selected the wholesale broker and the insurance carriers, and CCIG had the discretion to devise how to obtain coverage that complied with Club Valencia COA's request." Docket No. 106 at 11. No allegations in Club Valencia's counterclaims and third-party claims demonstrate that CCIG had discretion in selecting insurance for Club Valencia or had the authority to place insurance without

Club Valencia's approval.  *See* Docket No. 86.  Rather, Club Valencia's counterclaims and third-party claims allege that Club Valencia's property manager was responsible for administering and procuring insurance for the condominium complex.  *Id.* at 31, ¶¶ 20–24.  As such, Club Valencia's allegations fail to demonstrate that CCIG had the kind of broad discretion in procuring insurance for the condominium complex necessary to establish a fiduciary relationship.  *See Casey v. Phelan Ins. Agency, Inc.*, 431 F. Supp. 2d 888, 898 (N.D. Ind. 2006) (applying Indiana law) ("Phelan did not have broad discretion with respect to Rex's needs. . . .  [I]t was Rex's former agent at Gibson, Mike Miley, who reviewed the Phelan quote and counseled Rex that he should accept Phelan's offer.  In the end, Rex made the decision as to the amount of coverage to obtain and from whom.  Therefore, Phelan did not exercise broad discretion with regard to Rex's insurance coverage." (internal citation omitted)).

Finally, as Club Valencia concedes, CCIG did not receive additional compensation for advising Club Valencia regarding its insurance needs.  Docket No. 106 at 11 ("It may be true that Club Valencia COA did not pay separately for the advice it received . . . .").  The Court finds that this weighs against the plausibility of the allegation that CCIG had a special relationship with Club Valencia.  *See Platte*, 2020 WL 6281596, at *3 (courts consider whether insurance broker "receiv[ed] compensation, above the customary premium paid, for expert advice provided" (citation omitted)); *see also Kaercher*, 155 P.3d at 442 (citing *Tackes v. Milwaukee Carpenters Dist. Council Health Fund*, 476 N.W.2d 311 (Wis. Ct. App. 1991) (rejecting insureds' contention that agent assumed a duty to advise them on the benefits of underinsured motorist coverage, where there was no long-standing relationship of entrustment and the agent

14

did not receive any compensation for insurance consulting work other than the commissions he received from premiums)); *Shulman*, 618 F. Supp. 3d at 177 ("Plaintiffs do not allege that they made express agreements establishing a fiduciary duty with F & S or that they provided additional compensation to F & S apart from premium payments.").

Because the third-party claims against CCIG do not plausibly allege that CCIG counseled Club Valencia concerning specialized insurance coverage, held itself out as a highly-skilled insurance expert, exercised broad discretion to service Club Valencia's needs, or was compensated above the customary premium for its advice, the Court finds that Club Valencia has failed to plausibly allege that CCIG and Club Valencia had a special relationship.  *See Platte*, 2020 WL 6281596, at *3; *Kaercher*, 155 P.3d at 442 ("we perceive no allegations in the complaint that Sater had any special relationship of entrustment with Kaercher or that he held himself out as knowledgeable beyond the ordinary scope of an insurance agent—insured relationship").  Therefore, the Court finds that CCIG had no affirmative duty to advise or warn Club Valencia of provisions contained in the Illinois Union insurance policy, including the provisions about hard-wired smoke detectors.  *Kaercher*, 155 P.3d at 441 ("absent a special relationship between the insured and the insurer's agent, that agent has no affirmative duty to advise or warn his or her customer of provisions contained in an insurance policy"); *Sewell*, 535 F.3d at 1172 ("Insurance agents or brokers are not personal financial counselors and risk managers, approaching guarantor status, and it is well settled that agents have no continuing duty to advise, guide, or direct a client to obtain additional coverage." (citation omitted)).

Club Valencia argues that, even if CCIG did not have a special relationship with CCIG, Colorado law imposes on CCIG the duty "to procure the type of insurance coverage requested by the insured or to advise the insured that such coverage is not available." Docket No. 106 at 6. Club Valencia relies on the Colorado Supreme Court's decision in *Bayly, Martin & Fay, Inc. v. Pete's Satire, Inc.*, 739 P.2d 239, 243 (Colo. 1987). *Id.* In *Bayly*, the plaintiff, a bar and restaurant, requested that its insurance agent procure liquor liability insurance. *Bayly*, 739 P.2d at 241. The insurance agent "procured a multi-peril policy from Commercial Union, which policy, unknown to [plaintiff], did not provide liquor liability coverage." *Id.* The court held that "an insurance broker or agent who agrees to obtain a particular form of insurance coverage for the person seeking such insurance has a legal duty to obtain such coverage or to notify the person of his failure or inability to do so." *Id.* at 243. Club Valencia maintains that it requested that CCIG obtain a particular form of insurance, i.e. insurance that covered its condominium complex in the event of a fire and that was based on the complex's existing condition. Docket No. 106 at 13. Club Valencia appears to argue that, in the event Illinois Union's interpretation of the policy is correct and that the policy required hard-wired smoke detectors in each of its units, CCIG breached its duty to provide fire insurance based on the condition of the condominium complex, which included the absence of hard-wired smoke detectors in each unit. *Id.* at 6–12.

*Bayly* "stand[s] for the proposition that where an insurance agent promises to obtain a specific type of insurance requested by the insured, the agent assumes a duty to act reasonably in procuring the requested insurance." *Kaercher*, 155 P.3d at 442. Club Valencia argues that CCIG acted unreasonably by not procuring insurance that fit

16

the existing conditions of the building and by failing to inspect the condominium complex to ensure that Club Valencia received the necessary coverage.[5]  Docket No. 106 at 6–7, 13–14 ("If, as CCIG contends in the Motion, it needed to perform an inspection of the Complex to obtain a policy or inform Club Valencia COA of the inability to do so, CCIG had the duty to either perform an inspection or to notify Club Valencia COA that it could not procure insurance without doing the inspection.").  First, Club Valencia's counterclaims and third-party claims do not allege that CCIG failed to procure fire insurance.  Instead, it states that "Illinois Insurance issued an insurance policy #D42258003 005 (the "Illinois Insurance Policy") to the Club Valencia COA," that the "Illinois Insurance Policy is an all-risk replacement cost value policy and covers loss to the Insured Premises including fire losses," and that "[f]ire indemnity benefits were a covered cause of loss under the Illinois Insurance Policy."  Docket No. 86 at 40, 42, ¶¶ 71, 76, 88.  Therefore, *Bayly* is inapplicable to the circumstances of this case because Club Valencia did receive the specific type of insurance that it requested, namely, fire indemnity insurance.  Second, "an insurance agent's duty is to provide an insurance policy that covered the property based on a reasonable interpretation of the

---

[5] Although Club Valencia does not address the issue in its response, *see* Docket No. 106, Club Valencia's counterclaims and third-party claims allege that CCIG and CRC relied on outdated applications for insurance in procuring the Illinois Union insurance policy and that neither party conferred with Club Valencia to ensure that the insurance applications were accurate.  Docket No. 86 at 41, ¶¶ 79–80.  Even assuming that CCIG's and CRC's failure to submit accurate insurance applications breached their duty to act reasonably, Club Valencia does not identify what information was inaccurate in the applications.  *Id.*  As such, the allegations in Club Valencia's counterclaims and third-party claims do not demonstrate that any such inaccuracies caused Illinois Union to deny coverage based on Club Valencia's failure to have hard-wired smoke detectors in each unit.  Therefore, the allegations regarding inaccurate insurance applications fail to plausibly allege the fourth element of a breach of fiduciary duty claim, namely, that the breach caused Club Valencia's damages.  *Sewell*, 535 F.3d at 1172.

information that the agency had.  This duty does not include investigating whether the insured's representations to the agent are correct or appraising the property itself." *Shulman*, 618 F. Supp. 3d at 176 (citing *Bertelson v. Sunbeam Prods., Inc.*, 2005 WL 5895225 (Vt. Super. Ct. July 7, 2005)).  Because the allegations in Club Valencia's counterclaims and third-party claims demonstrate that Club Valencia requested and received an insurance policy that covered fire loss, Club Valencia has failed to plausibly allege that CCIG breached its duty to "act reasonably in procuring the requested insurance."[6]  *Kaercher*, 155 P.3d at 442.  Given that Club Valencia has failed to identify a fiduciary duty that CCIG breached, Club Valencia has failed to plausibly allege the second element of its claim for breach of fiduciary duty.  *Sewell*, 535 F.3d at 1172. Therefore, the Court dismisses Club Valencia's breach of fiduciary duty claim against CCIG.

### 2. Negligence Claim Against CCIG

"The elements of a negligence claim are a legal duty, a breach of the duty, causation, and damages."  *English v. Griffith*, 99 P.3d 90, 93 (Colo. App. 2004) (citing *Casebolt v. Cowan,* 829 P.2d 352, 356 (Colo. 1992)).  For claims against an insurance agent, the "'duty' element of negligence and fiduciary duty causes of action requires the same inquiry."  *Holborn*, 304 F. Supp. 3d at 404 (alterations omitted) (quoting *Muller–Paisner v. TIAA,* 289 F. App'x 461, 465 (2d Cir. 2008) (unpublished)); *see also*

---

[6] In its response to CRC's motion to dismiss, Club Valencia states that CRC "asserts that it complied with the duty to procure the form of coverage requested because it obtained policies from Illinois Union Insurance."  Docket No. 105 at 11.  Club Valencia argues that this "assertion is, however, a factual dispute that cannot be resolved at this stage of the proceedings."  *Id.*  This is not a factual dispute.  Club Valencia's counterclaims and third-party claims allege that the Illinois Union insurance policy covers fire damage, and the Court accepts this allegation as true.  Docket No. 86 at 42, ¶ 88.

*Kaercher*, 155 P.3d at 441 (analyzing whether a special relationship between insurance agent and insured imposed a duty for negligence claim); *Sewell*, 535 F.3d at 1172 (analyzing whether a special relationship between insurance agent and insured imposed a duty for breach of fiduciary duty claim).  Neither Club Valencia's counterclaims and third-party claims nor Club Valencia's response to CCIG's motion to dismiss identify a duty that CCIG breached other than the duties addressed by the Court in dismissing CCIG's fiduciary duty claim.  *See* Docket No. 86 at 58, ¶¶ 188–94; Docket No. 106 at 13–14.  Because the Court has determined that Club Valencia has not plausibly alleged that CCIG breached a duty to Club Valencia, Club Valencia fails to plausibly allege the second element of its negligence claim.  The Court will dismiss this claim.

### 3.  Negligence and Breach of Fiduciary Duty Claims Against CRC

Club Valencia fails to state negligence and breach of fiduciary duty claims against CRC.  First, Club Valencia argues that it has plausibly alleged that CRC had a special relationship with Club Valencia.  Docket No. 105 at 6–9.  "Club Valencia COA alleges that because of the challenges with procuring the insurance requested by Club Valencia COA, CRC's first-hand knowledge of the Complex, and CRC's long relationship with Club Valencia COA, Club Valencia COA trusted CRC to procure insurance of the type requested."  *Id.* at 7 (citing Docket No. 86 at 39, ¶¶ 66–67).  Club Valencia asserts that, since "CRC had first-hand knowledge about the age and features of the Complex, and since CRC had previously assisted Club Valencia COA with insurance claims, Club Valencia COA was reasonable in entrusting CRC to advise it on the impact of the now-disputed protective safeguards *before* Illinois Union Insurance asserted those safeguards to deny coverage."  *Id.* at 7–8.

19

In Club Valencia's counterclaims and third-party claims, Club Valencia alleges that CRC is identified as a "producer" on the Illinois Union insurance policy. Docket No. 86 at 37, ¶ 57. Club Valencia claims that CRC had placed multiple insurance policies for Club Valencia. *Id.*, ¶ 59. Club Valencia alleges that, through its prior inspections, through placing prior policies, and through communications with CCIG, CRC learned about the specific condition and features of the condominium complex. *Id.* at 37–39, 62, ¶¶ 57–67, 216. For the reasons discussed above, Club Valencia's allegations that CRC had a longstanding relationship with Club Valencia and the fact that CRC acquired knowledge about the specific characteristics of the condominium complex are insufficient to plausibly allege that CRC had a special relationship with Club Valencia. *Shulman*, 618 F. Supp. 3d at 177 (long-standing relationship insufficient); *Scott*, 2024 WL 1911226, at *13 (questionnaire to gain client specific information insufficient). This is especially true because Club Valencia does not allege that CRC received special compensation to act as an advisor and fiduciary to Club Valencia. *See* Docket No. 86; *see also* 4 Couch on Insurance § 55:5 (a "special relationship also exists when there is a long-term relationship of confidence in which the agent assumes a duty to render advice and is compensated accordingly, beyond the normal premiums").

Finally, Club Valencia argues that CRC's communications to Illinois Union regarding its belief that Illinois Union's coverage position is different from one taken by Chubb in 2017 evidence a fiduciary relationship between CRC and Club Valencia. Docket No. 105 at 4. Club Valencia provides no support for the proposition that an insurance agent expressing a post-loss opinion regarding a disputed claim evidences a pre-loss fiduciary relationship. Because the allegations in Club Valencia's

counterclaims and third-party claims fail to plausibly allege any of the factors courts consider in evaluating a special relationship between an insured and an insurance agent, *see Platte River*, 2020 WL 6281596, at *3 (citing *Parker*, 630 N.E.2d at 570), Club Valencia's argument on this point is unpersuasive, and the Court finds that Club Valencia has not plausibly alleged a special relationship with CRC.

Club Valencia makes the same argument regarding CRC's and CCIG's duty to provide a particular form of insurance under *Bayly*. Docket No. 105 at 5. Because Club Valencia received the form of insurance it requested, namely, coverage for fire loss, *Bayly* is inapplicable, and Club Valencia does not plausibly allege that CRC acted unreasonably in procuring the Illinois Union insurance policy. *Kaercher*, 155 P.3d at 442 ("the agent assumes a duty to act reasonably in procuring the requested insurance"). Club Valencia fails to plausibly allege that CRC breached a duty owed Club Valencia. Therefore, Club Valencia does not state either its claim of negligence or its claim of breach of fiduciary duty. The Court dismisses these claims against CRC.

### B. Breach of Contract

Club Valencia brings claims of breach of implied contract against CCIG and CRC, as well as a breach of contract claim against CRC. Docket No. 86 at 57–58, 61–63 ¶¶ 183–87, 209–18.

Under Colorado law, the elements of a breach of contract claim are "(1) the existence of a contract, (2) the plaintiff's performance of the contract or justification for nonperformance, (3) the defendant's failure to perform the contract, and (4) the plaintiff's damages as a result of the defendant's failure to perform the contract. *Univ. of Denver v. Doe*, 547 P.3d 1129, 1139 (Colo. 2024). A contract can be either express – manifested by either written or oral words – or implied – manifested by conduct. *Fair v.*

*Red Lion Inn*, 920 F.2d 820, 825 (Colo. App. 1995); *see also Osband v. United Airlines, Inc.*, 981 P.2d 616, 621 (Colo. App. 1998) ("there is no difference in legal effect between an express contract and a contract implied in fact").  "The essential elements of a contract are 'competent parties, subject matter, a legal consideration, mutuality of agreement, and mutuality of obligation.'"  *Autotech Techs., LP v. Palmer Drives Controls & Sys., Inc.*, No. 19-cv-00718-PAB-NRN, 2020 WL 1974759, at *3 (D. Colo. Apr. 24, 2020) (quoting *Peterson v. Trailways, Inc.*, 555 F. Supp. 827, 830 (D. Colo. 1983) (citing *Denver Truck Exch. v. Perryman*, 307 P.2d 805, 810 (Colo. 1957))).

CCIG and CRC argue that Club Valencia has failed to state a claim of breach of implied contract because Club Valencia has failed to plausibly allege that either CCIG or CRC entered into an implied contract to procure insurance for Club Valencia.  Docket No. 89 at 4–5; Docket No. 91 at 11–12.  CRC argues that, even if Club Valencia has plausibly alleged that there was a contract between Club Valencia and CRC, Club Valencia has failed to plausibly allege a breach of such contract.  Docket No. 89 at 4–5.

Club Valencia responds that its counterclaims and third-party claims allege (1) that Club Valencia requested that CCIG and CRC procure an insurance policy that was based on the existing condition and features of the building and covered the building in the event of a fire, (2) that CCIG and CRC agreed to procure such a policy, and (3) that Club Valencia paid a premium on the policy procured by CCIG and CRC.  Docket No. 105 at 10 (citing Docket No. 86 at 39, ¶¶ 65–68); Docket No. 106 at 13 (citing Docket No. 86 at 32–33, 39, ¶¶ 31, 32, 65).  The Court finds that, even if the allegations in Club Valencia's counterclaims and third-party claims plausibly allege that Club Valencia contracted with CCIG and CRC to procure an insurance policy that covers fire loss,

Club Valencia has failed to plausibly allege that CCIG or CRC breached their
agreement to procure the requested insurance.

As discussed above, "[u]nder Colorado law, 'an insurance broker or agent who
agrees to obtain a particular form of insurance coverage for the person seeking such
insurance has a legal duty to obtain such coverage or to notify the person of his failure
or inability to do so.'" *Est. of Hill*, 354 F. Supp. 2d at 1196–97 (quoting *Bayly,* 739 P.2d
at 243). "An agent who fails to do so may be liable either for breach of contract or
negligence." *Id.* (internal citation omitted) (citing *Mayhew,* 189 P. at 844–46; *Terry v.
Avemco Ins. Co.*, 663 F. Supp. 39, 41–42 (D. Colo. 1987); *Bayly,* 739 P.2d at 242–43).

Here, Club Valencia's counterclaims and third-party claims allege that CCIG and
CRC agreed to "obtain insurance based on the existing conditions and features of the
Insured Premises that would comply with Club Valencia COA's insurance requirements
and obligations pursuant to its governing documents, comply with Colorado law, and
would provide coverage of the Insured Premises in the event of a fire." Docket No. 86
at 36, 39, ¶¶ 49, 68. It also alleges that CCIG and CRC procured an insurance policy
that "covers loss to the Insured Premises including fire losses." *Id.* at 40, 42, ¶¶ 71, 76,
88. Nowhere in Club Valencia's counterclaims and third-party claims does Club
Valencia state how CCIG or CRC breached its contract to procure fire insurance for
Club Valencia. *See generally id.* Instead, Club Valencia's counterclaims and third-party
claims allege only that, "to the extent that Club Valencia COA has lost any insurance
coverage relating to the fires due to the actions or omissions of CCIG [and CRC] set
forth above, those breaches of implied contract by CCIG [and CRC], including the
failure to obtain the insurance coverage requested or notify Club Valencia COA of the

23

inability to do so, have caused Club Valencia COA damages in an amount to be shown at trial." *Id.* at 57, 61 ¶¶ 186, 211.  However, "[i]nsurance agents or brokers are not personal financial counselors and risk managers, approaching guarantor status." *Sewell*, 535 F.3d at 1172.  Club Valencia provides no support for the proposition that CCIG or CRC act as guarantors of the Illinois Union insurance policy if Club Valencia's interpretation of its insurance policy is inaccurate.  *See Shulman*, 618 F. Supp. 3d at 176 ("As long as the agent does the job without negligence, as between the agent and the purchaser, the task of reading and understanding the policy text is that of the purchasers.").  Given that Club Valencia alleges it received an insurance policy that covers fire loss and that Club Valencia's counterclaims and third-party claims do not identify how CCIG or CRC otherwise breached its contract to procure insurance for Club Valencia, Club Valencia has failed to plausibly state a claim of breach of implied contract against CCIG and CRC.

Although Club Valencia does not argue this in its responses, implicit in Club Valencia's counterclaims and third-party claims is the allegation that CCIG and CRC breached their agreements to obtain insurance for Club Valencia based on the existing condition of the condominium complex because the policy the brokers procured included "protective safeguards" that required hard-wired smoke detectors, which was not the condition of the complex.  The Court finds *Estate of Hill* instructive on the specificity of a request necessary to impose contract liability on an insurance agent to procure a particular kind of insurance.  *See Est. of Hill*, 354 F. Supp. 2d at 1196–97.  In that case, the plaintiff brought claims against his insurance agent for breach of contract, negligence, and breach of fiduciary duty for the agent's failure to inform the plaintiff of

the availability of personal injury protection ("PIP") benefits. *Id.* at 1195–96. The court applied the same analysis to the breach of contract claim as to the negligence claim, finding that where "an insurance agent or broker promises, or gives some affirmative assurance, that he or she will procure . . . a policy of insurance under circumstances which lull the insured into the belief that such insurance has been effect, the law will impose upon the broker or agent the obligation to perform the duty which the broker or agent has thus assumed." *Id.* at 1198 (quoting 4 Couch on Insurance § 46:46). However, the court found that the plaintiff had failed to state a claim of breach of contract against the insurance agent because, "in the absence of a more specific allegation that enhanced PIP benefits were requested or even discussed, [the agent] cannot be held liable for the policy's failure to include them." *Id.*

Club Valencia's counterclaims and third-party claims contain no allegations that Club Valencia discussed with CCIG or CRC the absence of hard-wired smoke detectors in each of its units or that, as part of the implicit agreement, Club Valencia requested and the brokers agreed to procure fire loss insurance based on this condition. *Id.* at 1196–97 (insurance brokers have "the obligation to perform the duty which the broker or agent has thus assumed" (quoting 4 Couch on Insurance § 46:46). In the absence of a more specific allegation that Club Valencia requested or discussed the complex's fire detection equipment and the need to procure insurance based on this equipment with CCIG or CRC, CCIG and CRC cannot be held liable for the policy's inclusion of a safeguard provision requiring hard-wired smoke detectors. *See id.*; *see also Shulman*, 618 F. Supp. 3d at 176 ("an insurance agent's duty is to provide an insurance policy that covered the property based on a reasonable interpretation of the information that the

agency had," "[a]s long as the agent does the job without negligence, as between the agent and the purchaser, the task of reading and understanding the policy text is that of the purchasers"); *Indiana Restorative Dentistry, P.C. v. Laven Ins. Agency, Inc.*, 27 N.E.3d 260, 268 (Ind. 2015), *as corrected* (June 2, 2015) ("Indiana courts have consistently held that agents may be liable for breach of contract *or* for negligent default in the performance of a duty imposed by contract when they fail to procure insurance requested by the insured. . . . Once an agreement is established under either theory, the duty to procure is the same." (citation and quotations omitted). The Court dismisses Club Valencia's claims for breach of implied contract against CCIG and CRC.

For the reasons discussed above, the Court also finds that Club Valencia has failed to state a claim for breach of contract against CRC. In Club Valencia's counterclaims and third-party claims, it alleges that it was a third-party beneficiary of a contract between CCIG and CRC, Docket No. 86 at 62, ¶ 217, "pursuant to which CRC was to act as a wholesale broker or producer to procure the type and amount of insurance requested by Club Valencia COA." *Id.*, ¶ 214. Club Valencia alleges that, "to the extent that Club Valencia COA has lost any insurance coverage relating to the fires due to the actions or omissions of CRC set forth above, CRC breached the contract with CCIG by failing to procure the type and amount of insurance requested by Club Valencia COA or notifying Club Valencia COA of the inability to do so." *Id.*, ¶ 215. Even if the Court were to assume that CCIG and CRC contracted to procure fire loss insurance for Club Valencia and that Club Valencia was a third-party beneficiary of the contract, Club Valencia fails to plausibly allege that CRC breached the contract. Instead, Club Valencia's counterclaims and third-party claims allege that Club Valencia

requested insurance that would cover the condominium complex in the event of a fire, that CRC is a producer of the Illinois Union insurance policy, and that the Illinois Union insurance policy "covers loss to the Insured Premises including fire losses." *Id.* at 37, 40, 42, ¶¶ 56, 76, 88.  The Court dismisses Club Valencia's breach of contract claim against CRC.

### C. <u>Colorado Consumer Protection Act</u>

In Club Valencia's counterclaims and third-party claims, Club Valencia asserts that CRC violated the Colorado Consumer Protection Act "by refusing or failing to obtain all governmental licenses or permits required to perform the services or to sell the Illinois Insurance Policy . . . , as agreed to or contracted for with a consumer, i.e., Club Valencia COA." *Id.* at 63, ¶ 220.  Club Valencia alleges that this was a deceptive trade practice and that the "deceptive trade practice caused actual damages or losses to Club Valencia COA because, . . . to the extent that Club Valencia COA has lost any insurance coverage relating to the fires due to the actions or omissions of CRC set forth above, CRC's deceptive trade practice caused it to fail to procure the type and amount of insurance requested by Club Valencia COA." *Id.* at 64, ¶ 224.

"The elements of Plaintiff's CCPA claim are '(1) that the defendant engaged in an unfair or deceptive trade practice; (2) that the challenged practice occurred in the course of defendant's business, vocation, or occupation; (3) that it significantly impacts the public as actual or potential consumers of the defendant's goods, services, or property; (4) that the plaintiff suffered injury in fact to a legally protected interest; and (5) that the challenged practice caused the plaintiff's injury.'" *Allstate Ins. Co. v. Cruz*, 733 F. Supp. 3d 1098, 1109–10 (D. Colo. 2024) (quoting *Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*, 62 P.3d 142, 146–47 (Colo. 2003)).

The parties dispute whether Club Valencia has plausibly alleged that CRC's failure to obtain necessary licenses had a significant public impact. *See* Docket No. 89 at 8–9 ("Even assuming, for purposes of this Motion, that the allegations made by Club Valencia related to CRC's alleged improper conduct and misrepresentations are true,[7] they still do not support Club Valencia's CCPA claim because they do not have a public impact as defined by Colorado caselaw.") (footnote added); Docket No. 105 at 14 ("When CRC's lack of licensure is analyzed using the foregoing factors, Club Valencia COA has plausibly alleged significant public impact" because "[w]ithout proper licensure, the policies procured by CRC could be deemed illegal by insurers, which could jeopardize coverage under every policy produced by CRC.").

The Court finds that it is not necessary to resolve whether Club Valencia has plausibly alleged the public impact element of its CCPA claim because Club Valencia does not plausibly allege the causation element of the claim. *See Martinez v. Lewis*, 969 P.2d 213, 221 (Colo. 1998) ("a plaintiff must establish five distinct elements to sustain a private cause of action under" the CCPA); *Cruz*, 733 F. Supp. 3d at 1109–10 ("The elements of Plaintiff's CCPA claim [include] . . . that the challenged practice caused the plaintiff's injury."). Nothing in Club Valencia's counterclaims and third-party claims suggests that Illinois Union is declining coverage because CRC was not a licensed broker when it procured insurance for Club Valencia. *See* Docket No. 86. Instead, Club Valencia's counterclaims and third-party claims assert that Illinois Union

---

[7] CRC denies that it was unlicensed. *See* Docket No. 108 at 10. However, the Court accepts as true the allegations in Club Valencia's third amended answer, counterclaims, and third-party claims. *See Twombly*, 550 U.S. at 555 (courts assume "all the allegations in the complaint are true (even if doubtful in fact)").

28

has denied coverage based on a lack of protective safeguards. *Id.* at 42, ¶¶ 89, 90.

Club Valencia's lack of protective safeguards is unrelated to CRC's alleged failure "to

obtain all governmental licenses or permits required to perform the services or to sell

the Illinois Insurance Policy." *Id.* at 63, ¶ 220. Therefore, Club Valencia fails to state a

claim under the CCPA. *Cruz*, 733 F. Supp. 3d at 1109–10. The Court dismisses Club

Valencia's CCPA claim against CRC. Because Club Valencia has failed to plausibly

allege any of its claims against CCIG and CRC, the Court grants the motions to dismiss.

## V.    CONCLUSION

For the foregoing reasons, it is

**ORDERED** that the Motion to Dismiss Defendant's Counterclaims and Third-

Party Claims [Docket No. 89] is **GRANTED**. It is further

**ORDERED** that defendant Club Valencia Condominium Owners Association,

Inc.'s fourth, fifth, and sixth third-party claims for relief are **DISMISSED with prejudice**.[8]

It is further

---

[8] The parties dispute whether dismissal of Club Valencia's claims should be with prejudice. Docket No. 89 at 11; Docket No. 91 at 13–14; Docket No. 106 at 14. CCIG argues that Club Valencia has had multiple opportunities to amend its answer, including the opportunity to amend its answer to address issues raised by a prior motion to dismiss. Docket No. 91 at 13–14 (citing Docket No. 72); *see also* Docket No. 61 (prior motion to dismiss). Club Valencia maintains that "all of the alleged defects in Club Valencia COA's complaint against CCIG are the type of factual pleading defects that can be cured by amendment." Docket No. 106 at 14. A "dismissal with prejudice is appropriate where a complaint fails to state a claim under Rule 12(b)(6) and granting leave to amend would be futile." *Knight v. Mooring Cap. Fund, LLC*, 749 F.3d 1180, 1190 (10th Cir. 2014) (citation omitted). "Where there has been the 'repeated failure to cure deficiencies by amendments previously allowed' the Court may conclude that it would be futile to allow further amendment." *Jones v. United Ass'n of Journeymen*, 2024 WL 1285546, at *18 (N.D. Okla. Mar. 26, 2024) (first quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962); and then citing *Mountain View Pharmacy v. Abbott Lab'ys*, 630 F.2d 1383, 1389 (10th Cir. 1980) (dismissing the plaintiffs' claims with prejudice after they were given "ample opportunity to present a legally sufficient pleading by means of the original complaint"). The Court finds that Club Valencia has had ample opportunity

**ORDERED** that Third-Party Defendant Cherry Creek Insurance Agency, Inc.'s

Motion to Dismiss Club Valencia Condominium Association, Inc.'s Third Amended

Answer, Counterclaims, and Third-Party Claims [ECF 86] [Docket No. 91] is **GRANTED**.

It is further

**ORDERED** that defendant Club Valencia Condominium Owners Association,

Inc.'s seventh, eighth, ninth, tenth, and twelfth[9] third-party claims for relief are

**DISMISSED with prejudice**.


DATED March 14, 2025.

BY THE COURT:

PHILIP A. BRIMMER
Chief United States District Judge

---

to amend its pleadings and that granting leave to file a fourth amended answer would
be futile.  Therefore, the Court dismisses Club Valencia's claims with prejudice.
    [9] Club Valencia's counterclaims and third-party claims identify Club Valencia's
CCPA claim as the twelfth third-party claim.  Docket No. 86 at 63.  However, Club
Valencia does not bring an eleventh third-party claim.  *See id.*  For the sake of clarity,
the Court adopts the numbering of Club Valencia's counterclaims and third-party claims
and dismisses Club Valencia's CCPA claim against CRC.