**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

| | | |
|---|---|---|
| ILLINOIS UNION INSURANCE COMPANY,<br><br>Plaintiff/Counter Defendant,<br><br>v.<br><br>CLUB VALENCIA CONDOMINIUM OWNERS ASSOCIATION,<br><br>Defendant/Counterclaimant,<br>Third-Party Plaintiff,<br><br>v.<br><br>LCM PROPERTY MANAGEMENT, INC., CHERRY CREEK INSURANCE AGENCY, INC., ***d/b/a*** CCIG, and CRC INSURANCE SERVICES, LLC.,<br><br>Third-Party Defendants. | ) | Civil Action No. 1:23-cv-1054-PAB-NRN<br><br>Judge Phillip A. Brimmer<br><br>Magistrate Judge N. Reid Neureiter |

**IUIC'S REPLY IN SUPPORT OF ITS MOTION FOR RECONSIDERATION (DKT. 252) OF THE COURT'S MARCH 10, 2026 ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT (DKT. 230)**

## I. Preliminary Statement

The Protective Safeguards Endorsement ("PSE") of the Policy required a safeguard the individual units did not have: "[h]ard-wired smoke detectors in each unit." (Order, Dkt. 230 at 2, 4–5.) Whether that defeats coverage turns first on whether Club Valencia ("CV") had "control" over the required safeguard. CV defends the Order's explanation that "if Club Valencia had such control over each condominium unit, there would be no need to specify that Club Valencia only has to maintain the protective safeguards 'over which you have control.'" CV explains that "if the association controlled every detector everywhere, as IUIC contends, the qualifier 'and over which

you have control' would be unnecessary to achieve the same result. The qualifier would be textbook example of 'surplusage.'" Both the Order and CV improperly *assume* that the existence of the phrase "and over which you have control" in the Policy means that there were some detectors over which CV had control and some over which CV did not have control, and this *assumption* is used as evidence that CV did not have control over the in-unit detectors. This is clearly erroneous and it defies the canons of contract interpretation as explained in IUIC's Motion.

The Policy does not establish whether CV actually had control over none, some, or all of the scheduled safeguards. It was possible that CV controlled none of them, all of them, or only some of them. The Policy language merely states how the PSE applies to an actual fire loss and carved out of the PSE's maintenance requirement any detectors, if any, over which CV had no control. It did not pre-determine whether there were any detectors over which there was no control. CV's acknowledgment that whether it "has control over a required safeguard becomes a relevant and material fact" (CV's Opp., Dkt. 254 at 11) is true after a loss, but the existence of the phrase cannot prove the fact of whether there was control. The existence of the phrase is agnostic on the fact. Whether there was actual-in-fact-"control" must be based solely on extrinsic evidence, not on the existence of the phrase in the Policy. The phrase proves nothing about whether control exists; it simply limits the PSE requirement to those detectors over which control, in fact, exists. The issue is the Order defined "control" as "responsibility for," but never applied that definition to the summary-judgment evidence. CV says the Order applied law to fact. It did not.

## II. The Order Never Applied Its Definition of "Control" to the Factual Evidence

The Order resolved the factual dispute over "control" without applying the evidence to the definition it ultimately adopted. It mentioned IUIC's evidence, but then rejected it because

accepting it would mean the "control" qualifier is not contractually necessary, and only then defined "control" as "to have responsibility for." (Order, Dkt. 230 at 10.) The Order never returned to that evidence under the definition it adopted. (*Id.* at 10–11.) In short, the Policy asked whether CV has "control" over a required safeguard. And the Order answered no because the Policy asked the question.

**A. CV turns the four-corners rule on its head: the rule keeps extrinsic evidence out of contract interpretation, not out of the factual inquiry.**

Absent ambiguity, courts do not look beyond the four corners of an agreement "to determine the meaning intended by the parties." *Am. Family Mut. Ins. Co. v. Hansen*, 2016 CO 46, ¶ 24, 375 P.3d 115, 121. After the contract meaning has been identified, whether a party performed its obligations is a question of fact. *Lake Durango Water Co. v. Pub. Utils. Comm'n*, 67 P.3d 12, 21 (Colo. 2003). CV agrees with that sequence. (CV's Opp., Dkt. 254 at 10–11.) CV's argument turns that sequence backwards. It defends the conclusion that CV lacked "control" as an "interpretive inference" that is "removed from the analysis of any extrinsic facts" and remains the same "regardless of the factual record." (*Id.* at 10.) But the Policy can make "control" a condition of CV's maintenance duty; it cannot establish by its own language whether that condition is satisfied. Once the Order defined "control" as "responsibility for," whether CV had that responsibility had to be determined from the evidence. The four-corners rule severs extrinsic evidence from contract interpretation. CV's argument has it severing facts from evidence.

**B. CV's three cited facts do not establish that it lacked "responsibility for" the required safeguard.**

CV nevertheless says the Order did apply its definition of "control" to the record. It points to three facts: CV did not own the private units, the units had battery-operated detectors, and the

common areas had hard-wired detectors. (CV's Opp., Dkt. 254 at 11.) None establishes the proposition the Order made dispositive—that CV lacked "responsibility for" the required safeguard. Non-ownership identifies who owned the units. The detector facts identify what equipment existed and where. The only safeguard listed in the Schedule, however, was "[h]ard-wired smoke detectors in each unit." (Order, Dkt. 230 at 9, 12.) Facts about ownership, battery-operated in-unit detectors, and hard-wired common-area detectors do not establish CV lacked "responsibility for" the required hard-wired in-unit detectors. CV separately argues that the governing documents place "control of and responsibility for in-unit smoke detectors" in the unit owners. (CV's Opp., Dkt. 254 at 9.) That is a different argument, based on different evidence, that also fails as further discussed below.

## III. CV Distorts the Canon Against Surplusage to Read a Condition Out of the Policy

The canon against surplusage *protects* contract language from being read out of an agreement. CV invokes it to *eject* any maintenance duty out of this one. CV argues IUIC's position is that the CV has "control" over "all detectors in all 329 units," so the qualifier "and over which you have control" would exclude nothing. (CV's Opp., Dkt. 254 at 7–8.) That is not IUIC's position. The PSE asks whether CV had "control" over the safeguard listed in the Schedule—hard-wired smoke detectors in each unit. (Order, Dkt. 230 at 2, 9.) The qualifier has a straightforward function: if CV has "control" over the required safeguard, the maintenance duty applies. Control? Duty. No control? No duty. A contractual condition does not become surplusage because the facts satisfy it.

Consider CV's position in the context of paragraph A.3 of the PSE, which requires CV to notify IUIC "if you know of any suspension of or impairment in any protective safeguard listed in

the Schedule." (Order, Dkt. 230 at 3.) Under CV's logic, by saying "if you know," the Policy implies CV does not know about any suspensions. If CV actually knew of one, the words "if you know" would be surplusage. CV therefore must not know of a suspension, and therefore has no notice duty. No one reads a notice condition that way. "If you know" states when the notice duty attaches; it is not evidence that CV lacks knowledge. The "Over which you have control" works the same way. It states when the maintenance duty attaches, not that CV lacks "control."

CV's tries to find some meaning for the "control" qualifier by pointing out that CV has "control" over hard-wired detectors in the common-area hallways. (CV's Opp., Dkt. 254 at 2, 6–8.) But the only required safeguard scheduled on the PSE is "[h]ard-wired smoke detectors in each unit." (Order, Dkt. 230 at 9, 12.) The hallway detectors are not required by PSE. If the hallway had no detectors, that would not be a breach the PSE's Condition. Under CV's position, the scheduled detectors are out because CV supposedly lacks control. The hallway detectors are out because they are not scheduled. CV's position does not give any meaning to the "control" qualifier. It negates it completely, rendering the maintenance duty impossible to trigger and impossible to breach. IUIC's construction—that the "control" qualifier *is a qualifier* that may or may not be factually satisfied depending on the evidence—is the only construction that gives it any meaning.

## IV. The Record Establishes That CV Had "Responsibility for" the Required Safeguard

The factual record establishes CV's "control" over the required safeguard listed in the PSE. The Bylaws authorize the Board to make and enforce rules governing the "operation, rental, use and occupancy of all of the Condominium Units." (Dkt. 198-29 at 3, art. IV, § 2(b).) Declaration § 18 requires owners to comply strictly with Association rules and authorizes enforcement through damages or injunctive relief. (Dkt. 198-28 at 10, § 18.) And the Articles authorize the Association

to enforce the Declaration and Bylaws and "to make and enforce rules and regulations as provided therein." (Dkt. 198 at 8, ¶ 49.) CV's Rule 30(b)(6) witness, Alan Kyte, was asked whether the Board had power to pass a regulation requiring unit owners to install hard-wired smoke detectors. He answered: "The board would have that power." (Dkt. 198-15, Kyte Dep. 46:18–47:4.) Thus, the Board could require hard-wired smoke detectors in each unit.

CV's "responsibility for" maintaining hard-wired smoke detectors in each unit is a function of its legal authority over the building as a whole. CV could require the exact safeguard the PSE demanded and enforce compliance if owners failed to install it. Power to impose the requirement plus power to enforce it is responsibility for whether the required safeguard existed at the property. Under the Order's definition, that is "control."

**V. CV both disclaims and maintains its "control" requires ownership argument.**

CV now insists that "[t]he Order does not hold that 'control' means 'ownership.'" (CV's Opp., Dkt. 254 at 8.) That does not answer IUIC's point, which was about the reasoning the Order used to reach its no-control conclusion. The Order defined "control" as "responsibility for," then immediately reasoned that CV does not "control, i.e. own, the individual units and the items within them," and treated individually owned units as the example of property CV does not control. (Order, Dkt. 230 at 10–11; Dkt. 252 at 8–9.) The Order defined "control" as "responsibility for," but its no-control conclusion equated ownership with control.

That ownership-centered reasoning came straight from CV's own summary-judgment theory. CV's summary-judgment reply was explicit that "control" had to be understood "in the context of the private ownership rights inherent to condominium units," and the in-unit detectors were therefore outside CV's "actual physical or legal control." (Dkt. 204 at 2.) Ownership was

not "incidental" when CV was asking the Court to grant partial summary judgment in its favor on that basis. It became "incidental" only after IUIC pointed out that the Order had equated ownership with "control" and skipped over a factual application of its "responsibility for" definition to the record.

But now that the Order defines "control" as "responsibility for," CV demotes ownership to an "incidental," "contextual," and "nonessential" explanation. (Dkt. 254 at 8–9.) Not just dicta, but judicial surplusage, if you will. But look closely: CV has not abandoned its ownership theory; it has only inserted "responsibility for" as the middleman between ownership and "control." Before, private ownership meant no "control." Now, private ownership supposedly means no "responsibility for," which in turn means no "control." The premise has not changed. Neither has the flaw.

CV also says the hallway hard-wired detectors are common elements, and relies on those common-area detectors as the hard-wired detectors over which it has "control." (Dkt. 204 at 6; Dkt. 254 at 2, 6.) But unit owners—not CV—own the common elements as tenants in common, while CV is responsible for maintaining and repairing them. (Dkt. 198-28 at 2, §2(d); id. at 9, §17(b)(1).) CV's own example therefore proves that ownership is not required for CV to have "control"—or "responsibility for"—a smoke detector at the property. Ownership may identify who holds title; it does not establish who had "responsibility for" the required safeguard.

CV's governing documents do not make the owners' responsibility for their units exclusive. Declaration §17(a) assigns owners maintenance and repair duties for specified property inside their units. (Dkt. 198-28 at 9, §17(a)(1)–(2).) But §17(a) does not say those duties are exclusive, and §17(b)(2)(e) requires CV to enforce the provisions of the "Declaration" and its "rules and

regulations." As Section IV, *supra*, shows, §18 separately requires owners to comply with Association rules and authorizes enforcement of those obligations. CV cannot turn an allocation of maintenance duties into an exclusivity clause the Declaration does not contain. Section 19 likewise governs amendments to the Declaration. (*Id.* at 10-11, § 19.) IUIC's theory does not require CV to amend the Declaration or convert the smoke detectors into common elements. It relies on the rulemaking and enforcement powers the existing governing documents already confer.

CV's final fallback adds a different word to the Order's definition: "operational." CV argues that the Policy's reference to turbines "owned or leased by you, or operated under your control" shows that "control" in the PSE requires "actual operational responsibility." (Dkt. 254 at 10.) But the Order defined "control" as "responsibility for," not "actual operational responsibility." (Order, Dkt. 230 at 10.) And where the Policy means operation, it says operation: "operated under your control." (Dkt. 198-1 at 29.) CV cannot import "operational" into the PSE's word "control." If "control" already meant "actual operational responsibility," then "operated" would add nothing to "operated under your control."

## VI. Reconsideration Is Needed to Correct the Order's Clear Errors and Complete the Missing Law-to-Fact Analysis

CV argues that reconsideration is improper because IUIC offers no new evidence or intervening law and merely reargues a position the Court rejected. (CV's Opp., Dkt. 254 at 4–5.) But new evidence and new law are not the only grounds for reconsideration: this Court has recognized that the inquiry also asks "whether the prior ruling was clearly in error." *Green v. Fishbone Safety Solutions, Ltd.*, 303 F. Supp. 3d 1086, 1091–92 (D. Colo. 2018) (Brimmer, J.); see Dkt. 252 at 4–5. And because the Order is interlocutory, *Fye* confirms that the Court retains "general discretionary authority to review and revise" its partial-summary-judgment ruling and is

not constrained by the strict Rule 59(e) or 60(b) standards. 516 F.3d 1217, 1224 n.2 (10th Cir. 2008).

That is what IUIC asks the Court to do here. The Order defined "control" as "responsibility for" but never applied that definition to the evidence. That omission carried into the Order's related errors: it used the canon against surplusage to make factual "control" impossible rather than to give the qualifier effect; treated ownership as dispositive of "control" after defining "control" as "responsibility for"; and used the Policy itself to resolve a factual question that the four-corners rule leaves to the evidence. These are structural errors that generated a ruling without the required analysis, not IUIC's disagreement with a result. Reconsideration asks the Court to correct those errors and complete the dispositive law-to-fact analysis it never performed. Correcting and completing an analysis the Order never performed is not relitigating one it did. And while IUIC maintains that its proffered definition of "control" is legally correct, the Court need not revisit that issue to correct the Order under its own definition.

## VII. IUIC Need Not Seek Reconsideration of Every Adverse Ruling to Vacate Partial Summary Judgment for CV

After CV faults IUIC for rearguing decided issues, it pivots and faults IUIC for not rearguing enough of them. CV argues that reconsideration should be denied because IUIC did not also challenge the Order's separate ruling under Paragraph A.2 of the PSE, which the Order ruled did not apply to a "P-9" scheduled safeguard. (CV's Opp., Dkt. 254 at 11–12.) IUIC respectfully disagrees with that ruling, but seeking reconsideration of one defense and ruling does not require IUIC to seek and win reconsideration of every other defense and adverse ruling. Paragraph B of the PSE makes breach of any Paragraph A condition sufficient to bar fire coverage. (Order, Dkt. 230 at 3.) Therefore, if CV breached the PSE's Condition, the separate ruling regarding Paragraph

A.2 cannot preserve coverage and need not be reconsidered now. And if reconsideration establishes that the PSE bars coverage, CV's bad-faith claims fail on the threshold ground IUIC originally asserted. (*See* IUIC's Mot. Sum. J., Dkt. 198 at 17.)

**VIII. Conclusion**

IUIC respectfully requests that the Court grant its Motion for Reconsideration (Dkt. 252); vacate its March 10, 2026 Order on Cross-Motions for Summary Judgment (Dkt. 230); deny CV's Motion for Partial Summary Judgment (Dkt. 188); and grant IUIC's Motion for Summary Judgment (Dkt. 198) for the reasons stated therein. At minimum, the Court should vacate its Order granting partial summary judgment to CV on the issue of "control," deny CV summary judgment on that issue, and allow the factual issue of CV's "control" over the PSE's required safeguard to proceed to trial.

Dated: August 14, 2026

Respectfully submitted,

*/s:/ Christopher M. Snow*

Matthew S. Ponzi (mponzi@fgppr.com)
Christopher M. Snow (csnow@fgppr.com)
Foran Glennon Palandech Ponzi & Rudloff PC
222 North LaSalle Street, Suite 1400
Chicago, Illinois 60601
(312) 863-5000
*Attorneys for Plaintiff, Illinois Union Insurance Company*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 14, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following counsel of record to their CM/ECF-registered email addresses:

M. Stuart Anderson
Thomas H. Wagner
ANDERSON LAW GROUP
Stuart@anderson-lg.com

Tom@anderson-lg.com

*Attorneys for Defendant, Counter Defendant,
Third-Party Plaintiff, Club Valencia
Condominium Owners Association, Inc.*

*/s:/ Christopher M. Snow*
Christopher M. Snow